0IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| DR. LEM BURNHAM and BARBARA BURNHAM, | HONORABLE JEROME B. SIMANDLE |
| Plaintiffs, | Civil No. 07-6101 (JBS/KMW) |
| v. | |
| WMC MORTGAGE CORP., et al., | **OPINION** |
| Defendants. | |

APPEARANCES:

Matthew B. Weisberg, Esq.
PROCHNIAK WEISBERG, PC
7 South Morton Avenue
Morton, PA 19070
    Counsel for Plaintiffs Dr. Lem Burnham and Barbara Burnham

Anthony J. Davis, Esq.
NICOLL DAVIS & SPINELLA LLP
95 Route 17 South
Suite 203
Paramus, NJ 07652
    -and-
Laura Mary Lestrade, Esq.
DORSEY & WHITNEY
250 Park Avenue
New York, NY 10177
    Counsel for the Defendant WMC Mortgage Corporation

**SIMANDLE**, District Judge:

    Presently before the Court is Defendant WMC Mortgage Corporation's motion for summary judgment on all claims by Plaintiffs Lem and Barbara Burnham [Docket Item 31].  Though initially bringing twelve causes of action against WMC, Plaintiffs have since waived all but two claims, one seeking rescission of their mortgage under the Truth in Lending Act

("TILA"), 15 U.S.C. §§ 1601-1667f, and one seeking relief under the New Jersey Consumer Fraud Act ("CFA"), N.J. Stat. Ann. §§ 56:8-1 to -195.  For the reasons expressed below, the Court will grant in part and deny in part Defendant's motion for summary judgment.  Plaintiffs may continue to pursue only their quest to rescind their WMC loans based on Defendant's alleged failure to provide proper notice of their right to rescind and may only seek voidance of any security interest and return of any related charges.

## I. BACKGROUND

### A. Facts

Dr. Lem Burnham is a former professional football player who subsequently earned a Masters Degree ("MD") and a Doctorate of Philosophy ("PhD") in psychology.  (Lem Burnham Dep. at 8-9, 22-23.)  Barbara Burnham, Dr. Burnham's wife, is a math teacher.  (Barbara Burnham Dep. at 6.)  In September 1997, Dr. and Mrs. Burnham purchased a newly constructed, five-bedroom home in Moorestown, New Jersey.  (Deed, Defs. Exh. E; Appraisal, Defs. Exh. D.)  Between 2003 and 2006, the Burnhams refinanced their home four times.  (Credit Report, Defs. Exh. G.)

On June 26, 2006, Plaintiffs received two loans from WMC; the first for $937,500 ("first loan") and the second for $250,000 ("second loan").  (Note and Balloon Note, Defs. Exh. J.)  These loans refinanced a loan from Fremont Mortgage Company for

$980,000.  (Fremont Loan Documents, Defs. Exh. H.)  Plaintiffs took the proceeds they received from the WMC loans for personal use.  (Lem Burnham Decl. at 111.)  In April 2007, Wells Fargo initiated foreclosure proceedings against Plaintiffs and on April 8, 2008, Plaintiffs signed a consent order in which they agreed not to contest foreclosure.  (Foreclosure Complaint, Defs. Exh. N; Consent Order, Defs. Exh. O.)  The Superior Court of New Jersey, Burlington County, entered a final judgment of foreclosure on June 23, 2009.  (Foreclosure Judgment, Docket Item 53.)

Plaintiffs allege that Darren Ginas, a mortgage broker with Apex Financial Group, Inc., falsely offered Dr. Burnham a job in order to induce Plaintiffs to enter into the June 2006 loans, but the job never materialized.  (Lem Burnham Dep. at 93, 96, 99-103.)  Plaintiffs admit that they never had any discussions with WMC regarding this job offer.

At issue in this case are the number of Notices of Right to Cancel provided to Plaintiffs, the amount of disclosed finance charges as compared to actual finance charges, and the appropriate and actual fee for title insurance.  Plaintiffs state that they did not receive the necessary two Notices of Right to Cancel for each of the June 2006 loans and that only one of the loans they received is dated.  (Pls. May 18, 2010 Aff't; Pls. Statement of Uncontested Facts ¶ A1-A2; Pls. Exh. A.)  Plaintiffs

did, however, sign Notices of Right to Cancel in which they each acknowledged receiving two copies of the required notices. (Defs. Reply Exhs. C & D.)  For the first loan, Plaintiffs were charged either $2,026 (Defs. Reply Exh. E) or $2,343.75 (Pls. Exh. C) for title insurance.  Plaintiffs offer a print-out from the Chicago Title Insurance Company's National Insurance Company that the title insurance fee for a loan of $937,500 would be $2,026.  (Pls. Exh. D.)  Finally, as to the first loan, Plaintiffs argue that the disclosed finance charges can be calculated by subtracting the amount financed, $898,515.22, from the loan amount, $937,500, for a disclosed finance charge of $38,984.78.[1]  (Pls. Exh. B.)  Plaintiffs state that they actually paid $38,984.78.  (Pls. Exh. C.)

**B.   Procedural History**

On December 21, 2007, Plaintiffs brought suit against WMC, as well as Mortgage Electronic Registration Systems, Inc., HomeQ Servicing Corporation, Barclays Capital Real Estate, Inc., Wells Fargo Bank, Apex Financial Groups, Inc., and Darren Ginas. Plaintiffs have since settled with all defendants except WMC, Apex, and Ginas [Docket Item 15].  Apex and Ginas have not entered an appearance in this case.  On October 2, 2009, WMC filed the instant motion for summary judgment.  After some delay,

---

[1] As will be discussed below, Plaintiffs have made a mathematical error by incorrectly asserting that the difference between $937,500 and $898,515.22 is $38,924.78.

the parties completed briefing on May 19, 2010, when Plaintiffs submitted, with Court permission, a sur-reply.  As discussed, in their opposition to summary judgment, Plaintiffs waived all claims against WMC except rescission under TILA and their claim under the CFA.  With respect to their "rescission" claim, Plaintiffs "seek rescission against WMC for the amount of the difference between the Fremont and WMC loan ($207,500), plus closing costs[.]" (Pls. Opp'n at 7.)

**II. DISCUSSION**

    **A.    Standard of Review**

Summary judgment is appropriate when the materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A fact is "material" only if it might affect the outcome of the suit under the applicable rule of law.  Id.  Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment.  Id.

    **B.    Truth in Lending Act**

Plaintiffs, perhaps acknowledging that their claims for actual or statutory damages under the TILA are time-barred pursuant to 15 U.S.C. § 1640(e) ("Any action under [for civil

damages under § 1640] may be brought . . . within one year from the date of the occurrence of the violation[.]"), maintain that they seek only rescission of the WMC loans under 15 U.S.C. § 1635.  Defendants did not address this claim in their opening brief, but on reply cite Rocco v. J.P. Morgan Chase Bank, No. 06-2438, 2007 WL 4180756 (3d Cir. Nov. 26, 2007) and argue that Plaintiffs cannot seek rescission because they consented to foreclosure, and then Defendant disputes on the merits the alleged TILA violations.  For the reasons expressed below, the Court will deny Defendants' motion for summary judgment on Plaintiffs' claim to pursue rescission of their WMC mortgage, but the Court will preclude Plaintiffs from pursuing "rescission damages" as requested.[2]

"The Truth in Lending Act regulates the relationship between lenders and consumers, including mortgagees and mortgagors, by requiring certain disclosures regarding loan terms and arrangements."  McCutcheon v. America's Servicing Co., 560 F.3d

---

[2] Though the Court was initially concerned about the possible application of the Rooker-Feldman doctrine to this case, as Defendant correctly points out, the doctrine is inapplicable because the foreclosure judgment was entered after the initiation of this suit.  See Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 284 (2005) ("The Rooker-Feldman doctrine, we hold today, is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.")

143, 147 (3d Cir. 2009). Among the protections of the TILA is the right to rescind a consumer credit transaction within three days following the transaction. 15 U.S.C. § 1635(a). The right to rescind extends to three years if "the required notice and material disclosures are not delivered." Id. § 1635(f); 12 C.F.R. § 226.15(a)(13). "Rescission essentially restores the status quo ante; the creditor terminates its security interest and returns any monies paid by the debtor in exchange for the latter's return of all disbursed funds or property interests." McKenna v. First Horizon Home Loan Corp., 475 F.3d 418, 421-22 (3d Cir. 2007).

    Defendant, in reply, attacks Plaintiffs' claim for rescission on two fronts. Defendant's first attack fails because it belatedly relies on (without explicitly mentioning) the doctrine of res judicata, an affirmative defense that Defendant failed to raise either in its answer or in its initial motion for summary judgment, so that any such claim is waived. Defendant argues that "Plaintiffs cannot assert a rescission theory after consenting to foreclosure" and cite Rocco v. J.P. Morgan Chase Bank, 255 F. App'x 638 (3d Cir. 2007). The Third Circuit in Rocco held that the Roccos were precluded by Pennsylvania law of res judicata from seeking to rescind their mortgage following a foreclosure judgment. Id. at 643. Even assuming that such a cursory argument is sufficient to "raise" the defense of res

7

judicata, where Defendant makes no mention of "res judicata" in the text of its reply and offers no authority under New Jersey law, Defendant cannot avail itself of this affirmative defense when it failed to raise this defense in its answer or its initial motion for summary judgment. See Fed. Rule Civ. P. 8(c); Estate of Finney v. Spyra, 130 F. App'x 527, 529 (3d Cir. 2005) (affirmative defense of res judicata waived because defendant failed to raise before trial court); Rycoline Prods. v. C & W Unlimited, 109 F.3d 883, 886 (3d Cir. 1997); see also Bayer AG v. Schein Pharmaceutical, Inc., 129 F. Supp. 2d 705, 716 (D.N.J. 2001) (argument raised for first time in reply must be stricken). The Court will not grant summary judgment to Defendant based on the doctrine of res judicata.[3]

Defendant next attacks Plaintiffs' grounds for invoking the three year period in which to rescind.  Plaintiffs argue that they have the right to rescind because (1) Defendant under-disclosed the finance charges by more than $35, (2) Defendant charged a title insurance fee that was not "reasonable," and (3)

---

[3] On June 3, 2010, after briefing was completed in this matter, Defendant submitted a copy of the final foreclosure judgment at the Court's request, along with a letter in which they suggest for the first time that Plaintiffs' rescission claims are also barred by New Jersey's entire controversy doctrine.  "[I]n federal court, the assertion that an action is barred by the Entire Controversy Doctrine is also an affirmative defense pursuant to that Rule [8(c)], included along with res judicata."  Rycoline Prods., 109 F.3d at 886.  The Court will not consider this defense because it was not raised in Defendant's answer or their motion for summary judgment.

Defendant did not provide the proper notice of the right to rescind.  The Court finds, and will explain below, that Plaintiffs have failed to raise a genuine dispute of fact regarding the disclosed finance charges and the reasonableness of the title insurance fee, but that there is evidence in the record from which a jury could find that Plaintiffs did not receive all necessary notices of their right to rescind.

Plaintiffs argue that they are entitled to the three year right to rescission because Defendant materially under-disclosed the amount of their finance charge for the first WMC loan of $937,500.  Disclosure of an erroneous finance charge justifies application of the three year rescission window if that disclosed charge varies from the actual charge by more than an amount tolerated by the TILA; in this case, because foreclosure proceedings had been instituted by the time Plaintiffs brought suit, the TILA tolerance is $35.  15 U.S.C. § 1635(i)(2); McCutcheon, 560 F.3d at 147, 149.  Under even Plaintiffs' version of the facts, however, Defendant did not under-disclose the finance charge. According to Plaintiffs, the amount of disclosed finance charges can be calculated by subtracting amount financed ($898,515.22 as evidenced in Pls. Exh. B) from the amount of the loan ($937,500).  Using Plaintiffs' formula, the disclosed finance charge is $38,984.78.  (Pls. Exh. B.)  Plaintiffs state that they actually paid $38,984.78.  (Pls. Exh. C.)  Therefore,

9

there is no difference between the disclosed and the actual finance charges. Plaintiffs' argument to the contrary is based on a mathematical error. Defendant is entitled to summary judgment on this ground.

Plaintiffs next assert that Defendant charged an unreasonable title insurance fee, so that the failure to disclose the amount in excess of a reasonable fee was material and implicated the three year period for rescission. "A fee for title insurance is generally exempted from inclusion in the finance charge. 15 U.S.C. § 1605(e)(1). However, title insurance is treated as a finance charge if is not 'bona fide and reasonable in amount.' 12 C.F.R. § 226.4(c)(7)." McCutcheon, 560 F.3d at 147. The parties disagree over the amount of the title insurance fee at issue. Plaintiffs point to an unsigned document entitled "Amount Paid to Others on Your Behalf," which states that the fee was $2,343.75. (Pls. Exh. C.) Defendant points to the signed U.S. Department of Housing and Urban Development ("HUD") Settlement Statement which lists the fee at $2,026 -- the amount Plaintiffs claim is a reasonable fee. (Def. Reply Exh. E.) Regardless, accepting Plaintiffs' evidence of a title insurance fee of $2,343.75, Plaintiffs have failed to offer evidence that such a fee was unreasonable. The only evidence that Plaintiffs provide regarding the "reasonableness" of the $2,343.75 fee is a printout from the website Chicago.Title.com

entitled "Chicago Title Insurance Company National Rate Calculator" with an effective date of April 4, 2010, stating that the "total charges" for a $937,500 loan would be $2,026.  (Pls. Exh. D.)  First, from the face of the printout it is clear that this estimated rate was effective in April 2010, approximately four years after the closing of the loan in question.  Second, even assuming that a title insurance fee from April 2010 is relevant, the mere fact that the Chicago Title Insurance Company puts the fee to be $2,026 does not suggest that a fee approximately 13% higher would be "unreasonable."  Without evidence of the prevailing rates on the date and in the region of the closing, a fact-finder has no basis for concluding that it is "unreasonable" to charge approximately $300 more than $2,026 for title insurance.  See Madera v. Ameriquest Mortgage Co., No. 07-1396, 2008 U.S. Dist. LEXIS 25864, 30-31 (E.D. Pa. 2008) ("Courts assess the reasonableness of title insurance premiums through comparison of the disputed charges with the prevailing rates of the industry in the locality.").

In support of its argument that $2,343.75 was an unreasonable title insurance premium, Plaintiffs point to the district court decision in Jefferies v. Ameriquest Mortgage Co., 543 F. Supp. 2d 368, 382 (E.D. Pa. 2008), where the district court found sufficient evidence that a $700 appraisal fee was unreasonable.  The plaintiff in Jefferies, in contrast to the

11

evidence here, submitted evidence from six different appraisers showing fees from $300 to $535. Id. That all six appraisers quoted fees at least 20% below the fee paid by Jefferies raised at least some question regarding the reasonableness of the charged rate. In this case, there is no evidence of the reasonable range of rates nor any suggestion that it was unreasonable to charge a rate approximately 10% higher than suggested by Chicago Title Insurance Company. Moreover, the Jefferies court rejected evidence regarding a reasonable mortgage fee where the document made clear that it became effective eight months after the closing, id. at 382 n.20., just as here the effective date of the proposed title insurance fee was four years after Plaintiffs closed their loan. The Court finds that Plaintiffs have not offered any evidence to show that $2,343.75 is unreasonable and so Defendant is entitled to summary judgment on this ground.

Finally, Plaintiffs argue that they did not receive the "required notice" of their right to rescind so that they are entitled to the three year period for rescission. See 12 C.F.R. 226.15(a)(3) & (b). Regulation Z of the TILA sets out the requirements for notice of the right to rescind:

> (b) Notice of right to rescind. In any transaction or occurrence subject to rescission, a creditor shall deliver two copies of the notice of the right to rescind to each consumer entitled to rescind (one copy to each if the notice is delivered in electronic form in accordance with the consumer

>consent and other applicable provisions of the
>E-Sign Act). The notice shall identify the
>transaction or occurrence and clearly and
>conspicuously disclose the following:
>
>(1) The retention or acquisition of a security
>interest in the consumer's principal dwelling.
>
>(2) The consumer's right to rescind, as described
>in paragraph (a)(1) of this section.
>
>(3) How to exercise the right to rescind, with a
>form for that purpose, designating the address of
>the creditor's place of business.
>
>(4) The effects of rescission, as described in
>paragraph (d) of this section.
>
>(5) The date the rescission period expires.

12 C.F.R. § 226.15(b).

Plaintiffs offer evidence, in the form of their own affidavit and with copies of the notices they allegedly received, that the Plaintiffs received only two notices of the right to rescind for each of the two WMC loans, and that only one of the four notices includes the date of the occurrence.[4]  (Pls. Aff.; Pls. Exhs. A & E.)  Defendant offers evidence that Plaintiffs signed Notices of Right to Cancel in which they each acknowledged receiving two copies of the required notices.  (Defs. Reply Exhs. C & D.)  "Notwithstanding any rule of evidence, written

---

[4] While it is true, as Defendant has argued, that in their opposition Plaintiffs failed to submit an affidavit to support the allegations in their statement of material facts, the Court will considered Plaintiffs' affidavit submitted in their sur-reply, just as the Court is considering Defendant's new merits arguments raised in their reply.

acknowledgment of receipt of any disclosures required under [the TILA] by a person to whom information, forms, and a statement is required to be given pursuant to this section does no more than create a rebuttable presumption of delivery thereof." 15 U.S.C. § 1645(c). Plaintiffs have offered evidence to rebut this presumption, in the form of their own statement adopting their charge that they did not receive the necessary notices, and so there is a genuine dispute as to whether Plaintiff received the proper form of notice of the right to rescind as required by the TILA. See 12 C.F.R. § 226.15(b). The Court will decline to grant summary judgment on this ground and will permit Plaintiffs to pursue rescission under 15 U.S.C. § 1635.

This conclusion does not end the Court's analysis of Plaintiffs' request for relief under the TILA, for though Plaintiffs claim to seek only rescission under § 1635, they call their requested relief "rescission damages" and "seek rescission against WMC for the amount of the difference between the Fremont and WMC loan ($207,500), plus closing costs, per TILA." (Pls. Opp'n at 7.) Such relief is not permitted under § 1635. Rescission under the TILA is intended to restore the status quo. McKenna, 475 F.3d at 421. As such, § 1635(b) outlines the relief brought by rescission: (1) return of any finance charges to the debtor and (2) voiding of any security interest held by the creditor. Barrett v. JP Morgan Chase Bank, N.A., 445 F.3d 874,

14

878 (6th Cir. 2006) ("[T]he Act gives the borrower who rescinds an eligible loan transaction the right to void the security interest and the right to recover statutorily identified finance charges incurred in the transaction."). In return, "the obligor shall tender the property to the creditor, except that if return of the property in kind would be impracticable or inequitable, the obligor shall tender its reasonable value." 15 U.S.C. § 1635(b); see Moore v. Cycon Enters., Inc., No. 04-CV-800, 2007 WL 475202, at *2 (W.D. Mich. Feb. 9, 2007) ("Although § 1635(b) specifies that the consumer's obligation to tender the property arises only after the creditor has performed its obligations of taking steps to terminate its security interest and returning any money or property given as a downpayment or earnest money, many courts . . . have recognized that the express language of § 1635(b), as well as equitable principles, permit a court to modify those procedures to condition the lender's obligations upon the borrower's tender of the amount due to the lender."). For this reason, "Not all debtors who suspect (or know) that they have been subjected to a TILA violation will choose to rescind, in large part because rescission entails the return of loan proceeds to the creditor." McKenna, 475 F.3d at 421-22.

In this case, therefore, should Plaintiffs succeed on their claim for rescission of the WMC loan, they may have any security interest held on the loan lifted and return of any monies

Plaintiffs paid for the loan, but Plaintiffs must then return the loan proceeds.  15 U.S.C. § 1635(b); McKenna, 475 F.3d at 421-22.  The remedy they request -- "the difference between the Fremont and WMC loan" or $207,500 -- is not an appropriate remedy under § 1635(b) because it does not rescind the loan or restore the status quo.  Instead, Plaintiffs would be left in the position they would have been in had WMC simply given them the loan proceeds as a gift, without taking a security interest in the home.  It appears that Plaintiffs are seeking to pursue a time-barred claim for actual damages under 15 U.S.C. § 1640(a)(1) in the guise of a request for rescission under § 1635.  The Court will not permit Plaintiffs to circumvent the statutory bar in this manner.  The only monetary remedy Plaintiffs may receive under § 1635(b) is return of "any finance or other charge" incurred through this loan process.

  **C. New Jersey Consumer Fraud Act**

 Plaintiffs argue on summary judgment that they should be permitted to pursue a claim under the CFA based on the alleged TILA violations as well a theory of "joint venture," whereby WMC should be held liable for the false job offer by Ginas.  Defendant responds by disputing the TILA violations and noting that there is no evidence to support Plaintiffs' "joint venture" theory.  As will be explained further below, the Court finds that Plaintiffs have offered no evidence to show that they suffered

16

any loss as a result of the only substantiated TILA violation and that no fact-finder could find, based on the evidence in the record, that Defendant entered into a joint venture with Ginas and Apex.

To establish a prima facie claim under the CFA, a plaintiff must offer evidence showing "1) unlawful conduct by defendant; 2) an ascertainable loss by plaintiff; and 3) a causal relationship between the unlawful conduct and the ascertainable loss." Bosland v. Warnock Dodge, Inc., 964 A.2d 741, 749 (N.J. 2009). Assuming that Plaintiffs can seek relief under the CFA based on a violation the TILA regulations governing the proper form of notice of the right to rescind (the only violation that survives summary judgment), Plaintiffs have offered no proof that they incurred any loss as a result of receiving two rather than four copies of the required notice of their right to rescind for each loan.  There is no dispute that they were, in fact, informed of this right.  No jury could find that Plaintiffs suffered any harm based on the number of form notices they received.  Defendant is entitled to summary judgment on Plaintiffs' CFA claim based on the TILA violation.

With respect to Plaintiffs claim that WMC can be held responsible for the alleged misconduct of Ginas and Apex under a theory of joint venture, there is insufficient evidence to support this theory.  The New Jersey Superior Court Appellate

17

Division summarizes joint venture as follows:

> A joint venture is defined as "'[a] special combination of two or more persons where in some specific venture, a profit is jointly sought without any actual partnership or corporate designation.'" Wittner v. Metzger, 72 N.J. Super. 438, 444, 178 A.2d 671 (App. Div.) (quoting Kurth v. Maier, 133 N.J. Eq. 388, 391, 31 A.2d 835 (E. & A. 1943)), certif. denied, 37 N.J. 228, 181 A.2d 12 (1962). It is "'an undertaking usually in a single instance to engage in a transaction of profit where the parties agree to share profits and losses.'" Ibid. For a joint venture to have been formed, the parties must have agreed upon the essential terms. A joint venture agreement does not exist if the terms are "so vague, indefinite and uncertain as to make it illusory and therefore unenforceable." Paley v. Barton Sav. & Loan Ass'n, 82 N.J. Super. 75, 82, 196 A.2d 682 (App. Div.), certif. denied, 41 N.J. 602, 198 A.2d 446 (1964). In determining whether a joint venture was formed, the court's primary consideration is the intention of the parties. Weichert Co. Realtors v. Ryan, 128 N.J. 427, 435, 608 A.2d 280 (1992).

Ginsberg v. Bistricer, No. A-5751-03T5, 2007 N.J. Super. Unpub. LEXIS 474, at *32-33 (N.J. Super. Ct. App. Div. Apr. 4, 2007). A joint venture generally requires "some or all of the following elements":

> (A) A contribution by the parties of money, property, effort, knowledge, skill or other asset to a common undertaking;
>
> (B) A joint property interest in the subject matter of the venture;
>
> (C) A right of mutual control or management of the enterprise;
>
> (D) Expectation of profit, or the presence of "adventure," as it is sometimes called;
>
> (E) A right to participate in the profits;

18

>   (F) Most usually, limitation of the objective to a
>   single undertaking or ad hoc enterprise.

Wittner, 178 A.2d at 675.

Plaintiffs have not offered any evidence regarding the relationship between Apex and WMC or any agreements the two businesses might have made, let alone what the terms of their alleged "joint venture agreement" might have been or the intent of the two parties.  See Wittner, 178 A.2d at 674 ("The joint venture is not a status created or imposed by law but is a relationship voluntarily assumed and arising wholly ex contractu, express or implied.").  The only evidence on which Plaintiffs rely is a copy of the form HUD-1 (or what they assert is the HUD-1 form) which indicates that some finance charges from the loan went to WMC and some went to Apex.  (Pls. Exh. C.)  No reasonable jury could conclude, based on such a form, that the two businesses made a joint venture agreement.  The Court will grant summary judgment to Defendant on Plaintiffs' claims under the Consumer Fraud Act.

### III. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendant's motion for summary judgment.  The Court will grant Defendant summary judgment on all of Plaintiffs' claims except for Plaintiffs' claim to rescind their WMC loans based on WMC's alleged failure to provide proper notice of their right to rescind.  The only remedy Plaintiffs may pursue is the

19

lifting on any security interest from those loans and the return of any related charges, in which event Plaintiffs will be required to return the loan proceeds.  The accompanying Order shall be entered.


**June 21, 2010**                         **s/ Jerome B. Simandle**
Date                                      JEROME B. SIMANDLE
                                          United States District Judge